IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| BROOKE JOHNSON, DENISE TRLICA, JAMIE MIDDLETON, JESSICA ROCKWELL, JOANNA KRUPA, LUCY PINDER, ROSIE WICKS, and TIFFANY TOTH GRAY, | ) ) ) ) ) ) | Case No. 4:22-cv-00146-SMR-HCA  ORDER ON MOTIONS |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| J.P. PARKING, INC., doing business as, BEACH GIRLS, | ) ) ) | |
| Defendant. | ) ) | |

Plaintiffs, eight professional models, brought this action against Defendant ("Club"), an operator of an Iowa strip club, for unauthorized use of their images and likeness on the Club's social media page. Defendant files a motion for summary judgment. It also moves to strike the testimony of Plaintiffs' expert witnesses, Dr. Thomas J. Maronick and Stephen Chamberlin. For the reasons discussed below, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART, [ECF No. 63]; the motion to strike the testimony of Dr. Maronick is DENIED, [ECF No. 72]; and the motion to strike the testimony of Chamberlin is GRANTED, [ECF No. 77].

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Defendant J.P. Parking, Inc., dba Beach Girls, published sixteen posts on the Club's Facebook page, between 2012 and 2016, that featured photos of Plaintiffs. Plaintiffs filed this lawsuit alleging that Defendant did not have authorization, consent, permission, or express legal authority to use Plaintiffs' images and likenesses. They assert claims for false endorsement and

1

false advertising under the Lanham Act; various common law causes of action (right to publicity, appropriation, false light); negligence; and unjust enrichment.  Plaintiffs maintain that they did not agree to allow use of their images to promote Defendant's establishment.  They further claim that an affiliation with the Club could negatively affect their modeling careers, reputations, and brands. They also argue that they were entitled to compensation for Defendant's use of their images.

Defendant responds that Plaintiffs cannot establish the elements necessary for their claims under the Lanham Act or the remaining state common law claims.  [ECF No. 63 (Defendant's Motion for Summary Judgment)].  Defendant also argues that the testimony of two expert witnesses disclosed by Plaintiffs are inadmissible under Federal Rule of Evidence 702.  [ECF Nos. 72 (Defendant's Motion to Strike Opinion of Plaintiffs' Expert Thomas J. Maronick); 77 (Defendant's Motion to Strike Opinions of Plaintiffs' Expert Stephen Chamberlin)].

## II.      ANALYSIS: MOTION TO STRIKE DR. MARONICK'S TESTIMONY[1]

The Court begins with Defendant's Motion to strike the testimony of Plaintiffs' Expert, Dr. Thomas J. Maronick.  [ECF No. 72].  Dr. Maronick is a marketing strategist and former marketing professor retained by Plaintiffs to opine on the likelihood of consumer confusion, one of the elements of a Lanham Act claim.

An expert's testimony may be admitted if:

> (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (2) the testimony is based on sufficient facts or data;

---

[1] Plaintiffs filed an untimely resistance to the motion to strike the testimony of Dr. Maronick, which they conceded was late and without cause.  Defendant urges the Court to strike the response.  There is no prejudice identified by Defendant, so the Court will consider Plaintiffs' arguments.  For the same reasons, the Court will also consider Plaintiffs' untimely resistance to the motion to strike the testimony of Chamberlin.

(3) the testimony is the product of reliable principles and methods;
and

(4) the expert has reliably applied the principles and methods to the
facts of the case.

Fed. R. Evid. 702. "The proponent of the expert testimony bears the burden to prove its
admissibility." *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1114 (8th Cir. 2007) (citation
omitted). "Decisions concerning the admission of expert testimony lie within the broad discretion
of the trial court." *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 415 (8th
Cir. 2005) (citation omitted). "Courts should resolve doubts regarding the usefulness of an
expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748,
758 (8th Cir. 2006) (citation omitted).

Defendant challenges the reliability and relevance of Dr. Maronick's proposed testimony.
An expert's testimony may be excluded if it is "so fundamentally unsupported that it can offer no
assistance to the jury." *Wood v. Minnesota Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997).
To satisfy the reliability requirement, the party offering expert testimony "must show by
a preponderance of the evidence both that the expert is qualified to render the opinion and that the
methodology underlying the conclusions is scientifically valid." *Khoury v. Philips Med. Sys.*, 614
F.3d 888, 892 (8th Cir. 2010) (citation omitted). "To satisfy the relevance requirement, the
proponent must show that the expert's reasoning or methodology was applied properly to the facts
at issue." *Id.* (citation omitted). "Vigorous cross-examination, presentation of contrary evidence,
and careful instruction on the burden of proof are the traditional and appropriate means of attacking
shaky but admissible evidence." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 596 (1993).

Defendant seeks to exclude testimony by Dr. Maronick regarding a consumer survey he
designed and conducted. Dr. Maronick's survey is an online questionnaire that seeks to assess

consumer perceptions of the women depicted in Defendant's social media posts.  [ECF No. 72-5 at 3].  Specifically, the study gauges the perceptions of survey participants as to whether the women shown: "a) have any affiliation with the club, b) approved use of their images, c) were paid for use of their images by the Beach Girls Club, and d) whether the respondents believe the women in the Beach Girls Club social medial posts/ads participate in some or any of the events or activities at the Beach Girls Club."  *Id.*  Plaintiffs argue this survey helps establish a claim for false endorsement under Section 43 of the Lanham Act.  *See* 15 U.S.C. § 1125 (a)(1)(A).

The Lanham Act "prohibits the use in commerce of a protected mark, whether registered or not, that is likely to cause confusion." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 416 (2023) (cleaned up); *see also Dryer v. Nat'l Football League*, 814 F.3d 938, 944 (8th Cir. 2016) (citation omitted).  The United States Court of Appeals for the Eighth Circuit has enumerated six factors to consider when determining whether a defendant's use of a mark creates a likelihood of confusion in the marketplace: "1) the strength of the trademark; 2) the similarity between the parties' marks; 3) the competitive proximity of the parties' products; 4) the alleged infringer's intent to confuse; 5) evidence of actual confusion; and 6) the degree of care reasonably expected of potential customers." *Duluth News-Tribune. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996).  These factors are not a mathematical formula but instead guides courts in the determination of whether a plaintiff could establish confusion in the marketplace before a fact-finder.  *Id*.

Plaintiffs assert that Dr. Maronick's survey "demonstrates Defendant's advertisements had the effect of confusing consumers concerning Plaintiffs' relationship with [Defendant]."  [ECF No. 84 at 2–3].  Specifically, they contend that the survey shows that a majority of consumers in the target market for the Club believed that all or some of the women in the social media posts:

"a) have agreed to sponsor or endorse the Beach Girls Club, b) have an affiliation, connection, or association with the club, c) have approved use of their images to promote the club, d) were paid for use of their images to promote the club, and e) that the women in the ads participate in activities at the Beach Girls Club." *Id.* at 3.  This result, they argue, is strong evidence to support the element of consumer confusion under the Lanham Act.  For this reason, they claim that Dr. Maronick's expert testimony is relevant and reliable under Federal Rule of Evidence 702, as well as the *Daubert* Standard.

Defendant opposes, arguing that Dr. Maronick's testimony is inadmissible under Rule 702 because it lacks a reliable foundation.  [ECF Nos. 72 at 2; 72-1 at 11].  Specifically, the Club points to several flaws in the survey that it contends undermines its reliability, namely that it did not use a generally accepted survey format; sample the relevant population; use an appropriate control group; provide standard survey instructions; or include quality control protocols for surveys.  Defendant also claims Dr. Maronick used irrelevant, ambiguous, and leading questions in the survey.  The Court reviews each assertion.

*A.  Did Dr. Maronick's Survey Fail to Use a Generally Accepted Survey Format?*

Defendant takes issue with Dr. Maronick's choice of survey format.  Defendant asserts that there are only two acceptable survey formats to assess the likelihood of confusion in a trademark infringement case: Eveready and Squirt.  [ECF No. 72-1 at 17].  Plaintiffs oppose, arguing that Dr. Maronick properly modified these two recognized survey formats as necessitated by the nature of this trademark infringement case.  According to Plaintiffs, the survey format chosen here applies better to the unique facts of this case.  Dr. Maronick points out that Eveready and Squirt formats may be more helpful to assess the "likelihood of confusion over the Beach Girls Club's trademark or its use of a mark similar to the marks used by Plaintiffs' to identify themselves as the source of

their own modeling work (i.e., their images)."  [ECF No. 72-6 at 7].  However, he writes in his rebuttal that these other formats are not helpful in this case where the Defendant used an exact image of each Plaintiff.  Instead, he developed this survey to examine a different question: whether the Club's use of an exact mark, in the manner that it did, is likely to confuse its customers as to Plaintiffs' association with, endorsement of, or sponsorship of the Club.

"General acceptance" is only one factor in determining admissibility of expert testimony. *Daubert*, 509 U.S. at 594.  Instead, the key focus in a Rule 702 inquiry is on an expert's own principles and methodology, not the advantages of other scientific methods, or other courts' preferences for one approach over another.  *Id*. at 595.  The Court finds Dr. Maronick's failure to use Everready or Squirt does not, standing alone, make his survey unreliable.  The Court must, therefore, independently examine the reliability of Dr. Maronick's principles and methodology, regardless of the advantages of utilizing either Everready or Squirt in a trademark infringement case, as set forth below.

### B.   Did Dr. Maronick's Survey Fail to Sample the Relevant Population?

Defendant next attacks the reliability of the survey on the grounds that it used an unrepresentative sample of survey participants.  Dr. Maronick narrowed the survey participants to Iowa residents, over 21 years old, who participated in or considered participating in activities at a gentlemen's club/cabaret in the last three years.  [ECF No. 72-5 at 5].  Defendant contends that the survey should have been limited to actual consumers of the Club or individuals who live less than 100 miles from it.  It also argues that the survey should have been limited to Facebook users.

Plaintiffs respond that Defendant's claim about overinclusiveness is ill-conceived and reject its proposed target market.  They assert that Dr. Maronick correctly surveyed the appropriate

target market because social media expands the reach of potential consumers beyond Defendant's narrow construction.  [ECF No. 72-6 at 6–7].

The sample of participants in Dr. Maronick's survey does not so pervasively undermine its reliability as to require exclusion of his testimony.  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (cleaned up) (citation omitted).  One consideration when evaluating the admissibility of survey evidence is whether "the proper universe was examined and the representative sample was drawn from that universe."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D. N.Y. 2007) (citation omitted) (cleaned up).  A survey that "may not perfectly represent the class" is not necessarily irrelevant or unhelpful such that it requires exclusion.  *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015).  "Sample surveys, by their very nature, are sketches, not exact replicas, of the examined population."  *Id.* at 1082–83 (citation omitted).

Dr. Maronick appropriately narrowed the class of potential survey participants to sample actual or potential consumers of the Club.  It is true that a majority of respondents lived more than 100 miles from the Club.  However, "of the 42 respondents who reported they had patronized the Beach Girls club, nearly 55% were more than 100 miles away at the time of the survey."  [ECF No. 72-1 at 13].  In other words, a majority of respondents who were *actual* customers lived a significant distance from the Club.  This information undermines Defendant's argument that a strict proximity based on miles to the Club is essential for reliability of the survey.  Furthermore, it is not the case that Dr. Maronick imposed *no* geographic requirements—survey participants needed to be Iowa residents.  Defendant offers no basis why the survey evidence should be excluded because Dr. Maronick chose to define geography by state of residence rather than an

arbitrary distance measured in miles.  Furthermore, the motion flatly states that Dr. Maronick erred by not screening for individuals who reside within a "reasonable driving distance" from the Club— apparently defined by Defendant as less than 100 miles.  [ECF No. 72-1 at 13].  There is no authority on what constitutes a "reasonable driving distance" or why the Court should use this conclusory assertion on the matter as a basis to exclude Dr. Maronick's testimony.

At his deposition, Defendant's counsel quizzed Dr. Maronick about why he chose Iowa residency as a requirement for participation in the survey, to the exclusion of potential respondents who reside "in different states but closer to Des Moines than other cities in Iowa."  [ECF No. 72-1 at 13].  This assertion by Defendant is at odds with its position that the survey should not have included participants who live more than 100 miles away.  Those familiar with Iowa geography are aware that the Des Moines metropolitan area, of which West Des Moines is included and where the Club is located, is in central Iowa. This means that few potential consumers reside in a neighboring state, but *within* 100 miles of Defendant's establishment.  Only portions of the Iowa-Missouri border are less than 100 miles from the Des Moines metropolitan area, none of which have a substantial population center.[2]  The arbitrary and inconsistent critiques by Defendant highlight the shortcomings of its argument on the unrepresentative sampling claim.

Additionally, Dr. Maronick adequately sampled for the participants' age, location, and demonstrated interest in the activities of similar clubs.  To the extent Defendant believes the survey's sample is overinclusive and unrepresentative, it will have the opportunity to cross-examine Dr. Maronick regarding his sampling choices at trial.

---

[2] Geographic distance has long been recognized as subject to judicial notice.  *See Sahr v. City of Des Moines*, --- F. Supp. 3d ----, ----, 2023 WL 2729436, at *1 n.1 (S.D. Iowa 2023).  The distance between the Des Moines metropolitan area and all other states are more than 100 miles.

*C.  Did Dr. Maronick's Survey Fail to Use an Appropriate Control Group/Image?*

The parties dispute the purpose of the survey, as well as what the appropriate control group should be to isolate factors that may impact its results.  Defendant argues that this is a causal study and urges that the appropriate control method in a causal study "utilize[s] randomized controlled experiments with between-subjects control groups, in which qualified respondents are randomly assigned to view *either* test or control stimuli."  [ECF No. 72-7 at 20].  Defendant asserts that Dr. Maronick's survey, if conducted appropriately, should have grouped the qualified participants into two separate sections: one group containing the images at issue in this case and one group without the images.  *Id*.  According to Defendant, this method is the generally accepted survey design for a causal study.   It asserts that without a control group, the results of the survey are unreliable.

Plaintiffs respond that Defendant misunderstands the nature of the survey and the purpose of the control images.  They do not explicitly dispute that the specified control method may be necessary to establish causality, but they claim that is not the intended purpose of the survey.  Instead, they contend that the control images are more appropriately grouped as they are in the survey, in order to "prove that consumers believe Plaintiffs, who are not dancers at the Beach Girls Club, are the same as the women in the two control images who are dancers at the Beach Girls Club."  [ECF No. 72-6 at 9].  Thus, a comparison of the images of actual dancers with Plaintiffs' images demonstrates consumer confusion regarding the parties' true relationship.

As Dr. Maronick explains in his rebuttal report, the survey aims to address the interpretation of consumers regarding whether the women in the images are dancers at the Club. The Court agrees that the issue in this case is not whether a consumer will be confused between Defendant's trademark and another similar mark.   The survey is intended to measure the

perceptions of the respondents to determine the likelihood that the disputed images cause confusion about any association with Defendant.

Defendant responds that the purpose of the survey is whether the use of the images "*caused* consumers to believe these women" have endorsed or are otherwise associated with the Club. [ECF No. 72-1 at 18].  According to Defendant, the inclusion of "control images" (images featuring real dancers) means that Dr. Maronick has no way of ascertaining the impact of "false positives" on his survey results.

Defendant's position on causality is unclear.  Despite its insistence that the survey's use of the images "caused confusion" the question in the case is whether the images *resulted* in confusion or were likely to result in confusion.  That is why Plaintiffs must prove a "substantial likelihood that the public will be confused."  *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 950 (8th Cir. 2023).  Defendant argues repeatedly that Plaintiffs cannot point to evidence of actual confusion, but also insists that the survey is insufficient to establish causality regardless.

Dr. Samantha Iyengar submitted an expert report opining on Dr. Maronick's survey. Dr. Iyengar zeroes in on a portion of the complaint where Plaintiffs allege that "Defendant's misappropriation of each Plaintiff's image, likeness, identity, or trade dress is **likely to cause confusion** as to" Plaintiffs' relationship with the Club.  [ECF No. 72-7 ¶ 45] (emphasis added). She writes "[t]his is a causal statement" which necessitates a causal survey, because a causal survey will reveal "not merely whether consumers hold inaccurate beliefs about Product A, but whether exposure to the [misappropriated mark] misleads the consumer into think that Product A is a superior [product]."  *Id.*  Dr. Iyengar draws the explanation from a secondary source which Dr. Maronick had cited in his report.  The inapplicability of that example is immediately apparent. A causal survey is useful to determine whether a consumer holds an inaccurate belief about a

product (effect) and whether exposure to a particular source misled the consumer regarding that product (cause).

Here, Defendants dispute the existence of the "effect" (confusion about the association of Plaintiffs with the Club) to the extent necessary to satisfy the element of a Lanham Act claim. However, there is nothing in the record before the Court—on either motion to strike or the summary judgment motion—to indicate that, to the extent any "effect" exists, that the causation was anything other than the social media posts at issue.  In other words, this is not a case of "whodunit" regarding confused perceptions of Plaintiffs' association with Defendant. Dr. Maronick states that the survey is for the purpose of measuring consumer confusion, or effect, not to ascertain causality.  That is the way the Court interprets the survey as well.

Thus, the Court finds that the assertion by Defendant that Dr. Maronick's survey lacked proper design to determine causality is not a basis to exclude his testimony at this point.  This conclusion does not mean that Dr. Maronick is free to testify about the results in a manner which the survey was not properly designed.  Judging from Dr. Maronick's rebuttal report and Plaintiffs' (scant) briefing on the issue, it appears there is no dispute that the survey was not properly configured to measure causality.  Thus, he should not opine on the matter.  However, the lack of any "causation" in the survey does not support exclusion of his testimony.

### D.  Did Dr. Maronick's Survey Fail to Provide Standard Survey Instructions?

Defendant next argues that exclusion of Dr. Maronick's testimony is proper because the survey did not include "standard instructions to avoid distractions, take the survey in one session, not open any other windows or tabs or view any other written material, and wear corrective lenses if needed."  [ECF No. 72-1 at 20].  It argues that such instructions are standard under "generally accepted survey principles," and the failure to include them results in unreliable survey results.

Plaintiffs reject Defendant's position.  They argue that the proposed instructions are not important in a short survey and point out that the survey provided other instructions that ensured reliable results.

Defendant's claim is not convincing.  First, Dr. Maronick's decision to not include the instructions identified in the motion is not a clear violation of generally accepted survey principles, much less such a significant violation as to require the exclusion of his testimony.  One source that Defendant relies on for its position is not as categorical as Defendant suggests.  Rather, the source recognizes that the nature of an online survey makes it difficult to confirm that respondents are giving proper attention to the questions.  To address this concern, it is suggested that an online survey expressly recommend that respondents avoid distractions during the survey-taking process.  [ECF No. 72-21 at 6].  Despite the recommendation to include express instructions about distractions, the authors acknowledge the limits of such admonitions, opining that a researcher should not rely solely on instructions to address the potential issue.

More importantly, there is nothing to indicate that a short instruction to a respondent to maintain attention is essential to this survey's reliability.  The survey was relatively brief.  The questions are not complex and there is nothing to indicate that the absence of a boilerplate instruction calls into question the reliability of its results.  Defendant's position is more of a "gotcha" argument than an effort to point out significant methodological flaws in the survey.  Rule 702 is intended to be permissive of expert testimony and courts are not to impose inflexible methodology requirements on experts.  *See Daubert*, 509 U.S. at 588 (finding that "a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'").  Defendant's claim

that the lack of standard instructions necessitates the exclusion of Dr. Maronick's testimony is groundless.

       *E.   Did Dr. Maronick's Survey Need to Include Other Quality Control Protocols?*

       Defendant similarly asserts that the survey lacked other essential quality control protocols. According to Defendant, the missing protocols include "CAPTCHA-type prompt to screen out automated responses, panel level checks, attention check questions, review of open-ended question responses, and analysis of response patterns." [ECF No. 72-1 at 20]. Defendant adds that the survey contains "poor-quality data" and the lack of "follow-up questions" is a significant methodological flaw. [ECF No. 72-7 at 36]. In response, Plaintiffs assert that these criticisms are meritless and not grounded in any survey research treatise or other authority.

       Defendant does not expound on its argument why the absence of these protocols necessitates the exclusion of Dr. Maronick's testimony. Some of the protocols identified are not defined, much less explained. This does not support a persuasive argument for exclusion.

       If there were any concerns about the survey's quality control protocols, this was satisfied by the internet survey platform used by Dr. Maronick. As he explains in his report:

> Vanguard's proprietary technology utilizes several innovative tools to combat security concerns. With the use of technology such as digital fingerprinting and geoIP tracking, Vanguard's Survey Defender software is able to generate user identification data to verify the authenticity of a particular respondent. In addition, key encryption decreases instances of data duplication through a specialized key encryption code. The notified panelist can only access a particular survey using the assigned keys once.

[ECF No. 72-5 at 4 n.1] (citation omitted). Defendant has not offered a basis to conclude that the survey sufficiently lacked quality controls to undermine its reliability and any testimony from Dr. Maronick about the results. Defendant's concerns about the quality of the data, as well as

other alleged calculation errors in the expert's report, are issues that can be raised on cross-examination to undermine the weight of his testimony.

   *F.   Did Dr. Maronick's Survey Use Irrelevant, Ambiguous, and Leading Questions?*

   Another basis on which the motion argues that the survey violated widely-recognized survey principles is Defendant's claim that improper questions were included.  Defendant argues that the questions themselves were flawed because they were leading, vague, and primed the survey-takers to give certain responses.  Plaintiffs reject all of Defendant's assertions, arguing that the questions in the survey did not influence its results.

   Defendant's arguments are supported by speculation and rebuttal by its own expert.  This position basically asks the Court to inappropriately choose between the parties' expert witnesses on a pre-trial motion rather than permitting a jury to serve its proper role of weighing evidence.  The reasons provided by Dr. Iyengar regarding the flaws in Dr. Maronick's survey is a matter for the jury to weigh.

   First, the claim that it was prejudicial to reference the social media posts as an "ad" is speculative.  Dr. Iyengar opines that when the survey refers to the images as "ads" it risked triggering pre-existing impressions of the respondents about the nature of advertisements and those who appear in them.  She takes her analysis further by concluding that the designation of the social media posts as "ads" in survey would have "likely" biased responses because consumers who viewed the posts at issue in their original form would not have viewed them as advertisements.  [ECF No. 72-7 at 31-32].  Dr. Iyengar does not provide support for this determination beyond her own analysis.

   Furthermore, the Court also finds that the concerns raised by Defendant and Dr. Iyengar about possible bias on this issue elides the fact that respondents were shown the entire Facebook

post at the beginning of the survey.  By reviewing the images as they would have been viewed at the time, the respondents were equipped with more context to decide on their own how to interpret the images regardless of the designation as an "ad."  [ECF No. 72-5 at 29–31].  Defendant's objection to the use of "ad" in the survey does not establish the unreliability of the survey methodology, but rather goes to the weight of the evidence.

Defendant also raises a variety of other complaints about the survey design which it contends undermines the validity of the results.  None of the reasons identified in the motion to strike—screening questions, order of the inquiries, and the failure to crop out non-parties in one image—are sufficient to exclude Dr. Maronick's testimony.

Another claim of error in the survey methodology is Defendant's assertion that the question posed by the survey about whether respondents "recognized" the identified Plaintiff is also meritless.  Dr. Iyengar writes that the question "Do you recognize the woman in the center of this ad?" is vaguely worded because respondents could have interpreted the question as recall exercise because the image have been shown multiple times earlier in the survey.  [ECF No. 72-7 at 34].  Dr. Iyengar does not explain what additional context should have been included in these questions, or why a failure to provide the context invalidates the reliability of the responses.  The interpretation of the question posited by Dr. Iyengar is speculative.  The question viewed in its context is not ambiguous, misleading, or unclear.

Defendant and Dr. Iyengar also fault Dr. Maronick for not asking a follow-up question to further inquire how a respondent recognized a specific woman.  There is no explanation why a follow-up question undermines the reliability of the responses other than to ferret out Defendant's claim that a respondent may have mistaken the questions for a recall exercise.  Dr. Iyengar's

opinion that the question is unhelpful without follow-up questions can be raised on cross-examination.

In sum, having reviewed the arguments by the parties and the record, the Court finds that Dr. Maronick's testimony about the survey and its results is reliable. Therefore, Defendant's motion to strike the testimony of Dr. Maronick is DENIED.

### III.   ANALYSIS: MOTION TO STRIKE STEPHEN CHAMBERLIN

Defendant also moves to strike the testimony of Plaintiffs' expert witness, Stephen Chamberlin. Chamberlin is a model and talent agent retained by Plaintiffs to opine on the fair market value of each image at issue. Defendant asks the Court to exclude his expert testimony because he is not qualified to opine on damages in this case and his methodology is unreliable. For reasons discussed below, the Court finds that Chamberlin is qualified, but ultimately concludes that his testimony should be excluded.

#### A.   Qualifications

Defendant asserts that Chamberlin is not qualified to opine on damages in this case. The damages at issue here, it claims, are valuations of single pre-shot images used by the Club on social media. Defendant acknowledges that Chamberlin's background and experience qualifies him to opine on "negotiating a contract for a model to book a photo shoot," as well as appraisals related to "advertising campaign[s] with a large corporation to be used across media outlets." [ECF No. 77-1 at 19]. However, Defendant claims these qualifications do not equate to an expertise regarding the precise damages at issue, technical knowledge concerning "negotiating with night clubs," and "negotiating the use of relicensed pre-shot images for social media." *Id*. The Court disagrees.

Under Rule 702, an expert may be qualified to give opinion testimony by their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The standard for admissibility is a liberal one, meaning an expert's testimony need only be "sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (citation omitted). Essentially, Rule 702 requires that "'the area of the witness's competence matches the subject matter of the witness's testimony.'" *Id.* at 1101 (citations omitted).

Notwithstanding the other issues in his report, the Court finds that Chamberlin possesses the requisite qualifications to testify regarding the fair market value of the subject images. His experience in the modeling industry spans over three decades, during which he represented over 5,000 models as their agent. More importantly, he "negotiated over ten thousand contracts (including day rates and usages)" and "ha[s] billed personally or overseen booking in excess of $100 million." [ECF No. 77-6 at 6]. This professional experience gives Chamberlin competence to assist the fact-finder with determining the fair market value of Plaintiffs' modeling services, as well as the nature of contract negotiations in the industry.

## B. Reliability

Expert qualification and methodological reliability are distinct questions for the Court in carrying out its gatekeeping role under Rule 702. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315–16 (9th Cir. 1995) ("[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist."). An expert's testimony is not admissible if the methodology employed by the expert is unreliable. *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 776–77 (8th Cir. 2021) (quoting *Union Pac. R.R. v. Progress Rail Servs. Corp.*, 778 F.3d 704, 709 (8th Cir. 2015)).

To satisfy the reliability requirement, "the testimony must be reliable or trustworthy in an evidentiary sense." *In re Bair*, 9 F.4th at 777 (citation omitted). The party offering expert testimony must establish that "the methodology underlying the conclusions is scientifically valid." *Khoury*, 614 F.3d at 892 (citations and quotation omitted). Not only must the methodology be valid, but the facts of the case must also be applied to the methodology in a reliable way. *See* Fed. R. Evid. 702(3) (requiring "the witness has applied the principles and methods reliably to the facts of the case"). A district court is not required to admit expert testimony "that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (citation omitted). Here, Chamberlin fails to bridge the analytical gap between the data and his conclusions regarding the fair market value for each image.

Chamberlin calculated each Plaintiff's damages by quoting a "day rate," or the base rate of compensation for each image, then applied that rate to specific usages. [ECF No. 77-6 at 13]. He defined the "day rate" as the "work by the model" on the day of the photo shoot. In determining the day rate for each Plaintiff, he considered three factors: (1) desirability, as measured by the number of social media follows, (2) work history, judged according to prior endorsements and advertisements, and (3) the nature of the business seeking the services including the type of product or service. *Id.* Once the day rate was established, he determined the number of usages of each image by Defendant. In this context, "usage" means the manner in which the images were distributed. This could include print advertisement, social media posts, third-party promotion, and branding uses. Chamberlin then multiplied the day rate with the number of usages to generate the following damages assessment for each Plaintiff: Brooke Johnson ($20,000), Denise Trlica

($30,000), Jaime Middleton ($40,000), Jessica Rockwell ($20,000), Joanna Krupa ($375,000),

Lucy Pinder ($40,000), Rosie Wicks ($20,000), and Tiffany Toth Gray ($60,000).

Chamberlin, however, does not explain how he calculated the day rate.  For each Plaintiff,

he provided a brief background of the model, a short list of key facts and documents he considered

in his damages assessment, and an application of his methodology (i.e., day rate multiplied by

usage) to determine the total compensation value.  The flaws in his report appear in the last section.

Specifically, he does not adequately explain his decisions to apply certain factors but not others.

For example, Chamberlin took into account Brooke Johnson's work and earnings history

by reviewing her past earning documents.  He states:

> Ms. Johnson provided over 20 Earning documents.  Ms. Johnson
> shows a yearly income from one client of over $40,000[.]  Ms.
> Johnson shows a contract guarantee income of over $24,000 plus
> day rate and appearance fees.  Ms. Johnson was paid $10,000 for a
> one-day photo session for Bacardi which included local magazine
> use for a 3 month period. Ms. Johnson has evidence of many
> assignments over a lucrative career but retained few contracts.

[ECF No. 73-5 at 30] (sealed).  Strikingly, he does not provide a comprehensive analysis of her

past work and earnings history.  Instead, he inexplicably focuses on the significance of three prior

agreements, resulting in a day rate lacking substantiation or analogical relevance.  For example,

the contract amount with Bacardi was based on more than a "one-day photo session" to produce

one photo.  The negotiated amount also permitted Bacardi to use her image for a three-month

promotion with a local magazine.  Chamberlin does not explain why he believes the Bacardi

agreement is reflective of her earning capacity as a whole.  He also does not attempt to clarify how

this contract is applicable to the facts in this case.  Chamberlin's report fails to account for how

long the images were used by Defendant when calculating damages.  This undermines his

reliability because it logically follows that the hypothetical contract amount with Defendant would

be less than that of the longer-duration Bacardi, not the same.   A similar issue exists in Chamberlin's assessment, or lack thereof, of Johnson's one-year contract with Leg Avenue.   That contract also consisted of other obligations, such as multiple appearances for promotional events and photo shoots.   *See Toth v. 59 Murray Enters., Inc.*, 15 CV-8028, 2019 WL 95564, at *12 (S.D. N.Y. Jan. 3, 2019) (excluding Chamberlin's report on similar grounds).   For each Plaintiff, he offers a broad summary of the factors considered in his overall calculation of damages.   However, he does not explain the factors in detail, quantify those factors, or describe how they contribute to his determination of the day rate.   Instead, he simply lists these factors and leaps to an unexplained conclusion that based on his "experience and expertise in this industry" the day rate for Johnson is $10,000.   [ECF No. 73-5 at 30] (sealed).   He calculates damages for other Plaintiffs in the same way.

He also makes unsupported assumptions in his report which further undermine the reliability of his damages calculation.   Another district court faulted Chamberlin for "improperly assum[ing] that separate licenses would have been agreed upon for each use of an image, rather than the issuance of a single license for all uses of each image."   *Toth*, 2019 WL 95564 at *12.   He states that Defendant's use of Johnson's image would be classified as "advertising" and "social media" for contract negotiation purposes.   He then multiples the day rate of $10,000 with the two usages to come up with the final fair market value compensation of $20,000.   Chamberlin provides no explanation, other than *ipse dixit*, as to why the parties would contract for two separate licenses of one image.   This assumption is contradicted by Plaintiffs' own prior contracts, which show that a Plaintiff would agree to a single license for all uses of an image without any additional compensation.   *See e.g.*, [ECF No. 73-7 at 5 (terms of Johnson's model release and consent form

with Leg Avenue)] (sealed).    As a result of his unexplained and unfounded assumptions, Chamberlin's damages assessment does not establish reliability for damages incurred by Plaintiffs.

Put simply, there is a wide analytical gap between the factors considered by Chamberlin and his estimated damages.  He does not provide sufficient explanation to cure this analytical gap. *See Joiner*, 522 U.S. at 146 (finding an analytical gap when the "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  Therefore, the Court will prohibit Chamberlin from offering testimony about the damages in this case.  Defendant's Motion to Strike is GRANTED.  [ECF No. 77].

## IV.    ANALYSIS: MOTION FOR SUMMARY JUDGMENT

Defendant moves for summary judgment for both claims brought under the Lanham Act. The first Lanham Act claims is for false endorsement under Section 1125(a)(1)(A) and the second claim alleges false advertising under Section 1125(a)(1)(B).

### A.  Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

To preclude the entry of summary judgment, the non-moving party must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The evidence is viewed "in the light most favorable

to the nonmoving party," which includes drawing all reasonable inferences in that party's favor. *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)). But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255.

### B.   Lanham Act Claims

#### 1.   False Endorsement under the Lanham Act

Defendant argues that Plaintiffs cannot establish a likelihood of confusion for their false endorsement claim.

The relevant portion of the Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person

15 U.S.C. § 1125(a)(1)(A). The false endorsement provision of the Lanham Act "prohibits 'false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device.'" *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103 (8th Cir. 2006) (quoting *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1108 (9th Cir. 1992)). Regarding this provision, Defendant asserts that Plaintiffs fail to establish that the Club's use of their images is likely to cause consumer confusion as to their affiliation or endorsement of the Club.

To determine whether a likelihood of confusion exists, courts typically apply a balancing test with six factors. The factors are:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and, (6) the type of product, its cost, and conditions of purchase.

*Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 763 (8th Cir. 2010) (quoting *Frosty Treats Inc. v. Sony Comput. Ent. Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005)). Courts "do not apply any mathematical formula in analyzing these factors." *Id.* Instead, courts "use them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion." *Id.*

Defendant argues that the balance of the factors qualitatively weighs in its favor. In response, Plaintiffs makes two arguments as to why Defendant's motion should be denied.[3] First, they argue that the six factors merge into a single factor when an alleged infringer uses an exact mark of a trademark owner. In that case, they argue the sole consideration is whether a defendant exceeded the scope of a license to use the mark. [ECF No. 82 at 20] (citing *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 473 (8th Cir. 2011). Plaintiffs do not provide extensive support for this proposed single factor test. The case which they do identify is distinguishable, pertaining to a case where a defendant actually had a license to use a protected mark but used it in an unauthorized manner. *See Masters*, 631 F.3d at 472. Nevertheless, Plaintiffs' position on the

---

[3] Defendant notes the deficiencies in Plaintiffs' Resistance. [ECF No. 88 at 4]. Notwithstanding, the Court declines to constitute the material facts as admitted. *See* LR 56(b) (stating that "[t]he failure to respond to an individual statement of material fact, with appropriate appendix citations, ***may*** constitute an admission of that fact.") (emphasis added).

proper inquiry has no bearing on the disposition of the motion for summary judgment because the Court concludes there is a material fact in dispute regarding a violation of the Lanham Act.

a.   Six Factor Analysis

The parties take opposing positions regarding the balance of the six factors.  Defendant argues that five factors weigh in its favor, conceding the one factor does not.  Plaintiffs oppose, claiming that all six factors are favorable to their case.

A factor is only relevant in this balancing test in that it may assists the Court in determining whether a genuine dispute exists.  *See Sensient Techs.*, 613 F.3d at 763.  The second, third and sixth factors are not helpful to the Court.  Although Defendant concedes that the two marks are the same, the second factor is not instructive to determine whether a likelihood of consumer confusion exists because the disputed confusion does not arise by the similarities of the marks, but by Defendant's usage of exact marks in the manner that it did.

The third factor—the degree to which the products compete with each other—sheds little light on the likelihood of confusion.  Plaintiffs ask the Court to consider the factor as a social media marketplace through which the parties compete with each other to sell women's beauty and sex appeal.  However, as other courts have explained, "the shared use[] of the internet as a marketing channel is ubiquitous and, thus, does not shed much light on the likelihood of consumer confusion." *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1077 (N.D. Cal. 2012) (citing *Network Automation v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011)).

Furthermore, assessing the parties' competitive proximity is unhelpful to the Court because the parties operate in different levels of an industry.  Plaintiffs are models who would be considered, in a tenuous analogy at best, the "labor" in this relevant market.  Defendant is an

-24-

employer in this conceptualization. The link between the two levels does not analogize a direct or indirect competition in the marketplace.  In this context, the third factor is inapplicable.

For the same reason, the sixth factor—the degree of consumer sophistication based on the type of product, the price, and the conditions of purchase—does not meaningfully contribute to the inquiry.  *See Frosty Treats*, 426 F.3d at 1010 (noting that this factor is "more important in confusion-of-source cases where the degree of care that the purchaser exercises in purchasing a product can eliminate the confusion that might otherwise exist.") (citing *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)).  As is the case with the third fact, Plaintiffs and Defendant do not compete or otherwise interact as direct marketplace competitors, so the degree of consumer sophistication is unhelpful to assess likelihood of consumer confusion.

As the second, third and sixth factors are unhelpful, the Court turns to the remaining three factors.

i.    Strength of the Mark

"A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one."  *Frosty Treats*, 426 F.3d at 1008.  The strength of the mark is generally measured by its conceptual and commercial strength.  *ConAgra, Inc. v. George A. Hormel & Co.*, 784 F. Supp. 700, 708–15 (D. Neb. 1992).  The conceptual strength of Plaintiffs' marks is not relevant in this context.  *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 485–86 (8th Cir. 1991) (classifying the conceptual strength of a mark into four categories: generic, descriptive, suggestive, arbitrary, or fanciful) (citation omitted).  Instead, the dispute in this case concerns the commercial strength of Plaintiffs' marks.

The commercial strength considers the "marketplace recognition value" of the mark. *ConAgra*, 990 F.2d at 369.  The degree of the mark's public recognition may be evidenced by the

extent of advertising, sales growth, publication in newspapers and magazine articles, and survey evidence. *See Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 888 (8th Cir. 2014).

Defendant asserts that Plaintiffs have weak marks, arguing in general that they do not have public recognition and renown sufficient for protection under the Lanham Act. The motion provides an extensive list why Defendant believes their marks are weak. Among the reasons are: (1) Plaintiffs are not celebrities; (2) they have not earned significant income from modeling; (3) their modeling portfolios are limited; (4) their social media following is small and non-monetized; and (5) any recognition on social media was not present from 2012 to 2016 when the posts at issue were on the Club's Facebook page. Defendant adds that Plaintiffs have not provided evidence on summary judgment of actual recognition arising from the Facebook posts. [ECF No. 67 at 26–29]. Plaintiffs defend the strength of their marks, pushing back against the notion that celebrity status is a prerequisite to protection under the Lanham Act. They contend that Defendant mischaracterized their renown by overemphasizing certain information, while ignoring the other professional accomplishments. [ECF No. 82 at 22].

Defendant relies on two cases out of the United States District Court for the Southern District of New York to support its position. In *Pelton v. Rexall Sundown, Inc.*, the court found that a plaintiff's appearance in a Sports Illustrated Swimsuit Issue from over a decade prior, as well as her occasional work in advertising, was not sufficient to establish a strong mark. [ECF No. 67 at 26] (citing *Pelton v. Rexall Sundown, Inc.*, No. 99 Civ. 4342 JSM, 2001 WL 327164, at *3 (S.D. N.Y. Apr. 4, 2001). In a 2019 case, a court rejected similar contentions by a group of plaintiffs, noting that "[s]imply listing brands or magazine titles is insufficient" to establish a strong mark. *Id.* (citing *Toth*, 2019 WL 95564, at *1).

These two cases are distinguishable.  In *Pelton*, the court noted that the photograph at issue did not show the plaintiff's entire face, giving credence to the defendant's argument that she is not recognizable to the ordinary consumer.  *Pelton*, 2001 WL 327164, at *3 (stating that "[t]here is simply no evidence that a consumer who sees this photograph is likely to recognize Plaintiff . . . particularly because her face is partially covered by her arm.").  In this case, most of the photos at issue show a Plaintiff's entire, unobscured face.  A few images depict faces that are partially obscured by the angle or shadow in the photograph, or the model's hair, but there is no valid serious claim that any Plaintiff is unrecognizable by virtue of the photograph itself.

Second, Plaintiffs do not rely solely on their social media presence, earnings, and portfolio to establish the strength of their marks.  Plaintiffs also provide survey evidence of actual recognition from the Club's target audience.  *See* [ECF No. 72-5 at 3 (summarizing the survey's findings whereby, among other things, most respondents believed that all or some of the women depicted in the social media posts at issue had agreed to sponsor or endorse the Club)].

Defendant has not shown that no reasonable jury could conclude that each Plaintiff has a strong mark if presented with evidence identified by Plaintiffs.  They are entitled to all reasonable inferences on summary judgment.  The record does not reflect that this factor supports entry of summary judgment in favor of Defendant.

## ii.    Defendant's Intent

The Court next assesses the fourth factor: "the alleged infringer's intent to pass off his goods as those of the trademark owner." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005).  Defendant claims there is no evidence of intent because the Club hired a third-party to maintain its social media accounts and it was unaware of any alleged misappropriated use of Plaintiffs' images by the third-party contractor.  [ECF No. 67 at 31].  Plaintiffs push back against

Defendant's explanation, stating it is still responsible for the actions of his managers, partners, and agents. They also argue that it is not relevant in a likelihood of confusion context to discern whether an alleged infringer intended to misappropriate the images at issue. Instead, they assert that the operative question here is whether Defendant intended to mislead consumers into believing the women depicted in the posts were associated with the Club.

The purpose of the "intent" factor is often confused by parties in a trademark infringement action. "[I]ntent . . . is relevant not because trademark infringement requires intent, bad faith, or any other *mens rea*." *Kemp*, 398 F.3d at 1057. "Instead, this [fourth] factor is relevant because it demonstrates the [alleged infringer's] *true opinion* as to the dispositive issue, namely, whether confusion is likely." *Id*. In *Kemp*, the alleged infringer failed to convince the court that this factor weighed in his favor because he had mistakenly believed he was entitled to use the mark by contract. Instead, the Eighth Circuit found that he fully admitted his "intention to appropriate for his own benefit the considerable equity" of the original mark. *Id*. at 1056. Therefore, the operative question—intent to confuse consumers—was resolved against him. "[I]t is irrelevant that he may have believed contract rights excused his use," as he ultimately intended to profit from the brand of the original mark. *Id*. at 1057. The court stated that "this evidence permits only one possible conclusion, namely, that Mr. Kemp believed consumers would associate his products with those of the senior user." *Id*.

The same is true in this case. It is not relevant whether Defendant knew or did not know that the Club's third-party contractor, Blue Frog, properly obtained these images through the necessary licensing agreements. It is hardly undisputed that Defendant, as a business in the market of selling women's beauty and sexual appeal, did not intend to procure some benefit by use of these images on its official business Facebook page. Defendant has not established as a matter of

law that it did not intend for its consumers to associate Plaintiffs as depicted in the posts with the Club. This factor, therefore, does not favor summary judgment in favor of Defendant.

### iii. Actual Confusion

The fifth factor considers whether there have been incidents of actual confusion. "Although such incidents are proof of the likelihood of confusion, the plaintiff is not required to bring forth incidents of actual confusion to succeed in an infringement case." *Sensient Techs.*, 613 F.3d at 768 (citing *SquirtCo.*, 628 F.2d at 1091). "In analyzing this factor, weight is given to 'the number and extent of instances of actual confusion.'" *Id.* (citing *Duluth News–Tribune*, 84 F.3d at 1098).

A plaintiff may present survey evidence to establish actual confusion. *See Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 775 (8th Cir. 1994). In *Anheuser-Busch*, the Eighth Circuit held that findings from a valid consumer survey "strongly indicates actual consumer confusion." *Id.* (reviewing a consumer survey that showed respondents believed the "parody" advertisement was approved by Anheuser–Busch, with some even believing "the parody was an actual Anheuser–Busch advertisement."); *see also Masters*, 631 F.3d at 473 (stating that "[t]he plaintiff may prove actual confusion 'through the use of direct evidence, *i.e.*, testimony from members of the buying public, as well as through circumstantial evidence, *e.g.*, consumer surveys or consumer reaction tests.'") (citation omitted).

In support of its claim regarding the absence of actual confusion, Defendant relies on its position that Dr. Maronick's testimony is inadmissible. It explains that "[a]part from the flawed expert report, Plaintiffs have produced no evidence of actual confusion amongst consumers with respect to the subject photographs." [ECF No. 67 at 34]. Given the conclusion that Dr. Maronick's testimony is admissible, the Court finds that Plaintiffs provide sufficient evidence of actual

confusion through the survey evidence to withstand summary judgment. This factor weighs in Plaintiffs' favor.

### b. Conclusion

Ultimately, Plaintiffs offered sufficient evidence that a jury could reasonably find that a likelihood of confusion exists. Summary judgment is also inappropriate because most of the relevant factors weigh in Plaintiffs' favor. Therefore, the Court denies Defendant's motion regarding the false endorsement claim under the Lanham Act.

### 2. False Advertising under the Lanham Act

In addition to their claim for false endorsement, Plaintiffs assert a second violation of the Lanham Act for false advertising. Similar to the false endorsement claim, the false advertisement provision of the Lanham Act prohibits the misrepresentation of goods—from the advertiser or another person—through commercial advertisements or promotions. *Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 514 (8th Cir. 1996). A prohibited misrepresentation may concern "the nature, characteristics, qualities, or geographic origin" of the goods. 15 U.S.C. § 1125(a)(1)(B). To establish a claim under this provision for false advertisement, a plaintiff must establish:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
>
> (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
>
> (3) the deception is material, in that it is likely to influence the purchasing decision;
>
> (4) the defendant caused its false statement to enter interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998) (citations omitted). Additionally, a false advertising claim under the Lanham Act is only extended to protect a plaintiff's injuries that fall within the "zone of interest" contemplated by the statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014). Specifically, a false advertising claim only protects a plaintiff who "allege[s] an injury to a *commercial* interest in reputation or sales." *Id*. (emphasis added). Further, the injury must also be proximately caused by Defendant's violation of the Lanham Act. *Id*. at 133 (stating that a plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff.").

Here, the only contested element of the false advertising claim is the fifth element, asking whether Plaintiffs have been injured, or likely been injured, by Defendant's actions. Plaintiffs allege two injuries flowing from Defendant's misappropriation of their images: (1) actual damages arising from deprivation of the fair market value compensation they would have otherwise received for the authorized use of their image or likeness and (2) harm to their goodwill and reputation, arising from Defendant's unauthorized use of their images.

Defendant does not argue that the injuries pled by Plaintiffs do not fall within the scope of the Lanham Act. It asserts there is no evidence that Plaintiffs suffered from any of the injuries in fact. [ECF No. 67 at 37–38]. Plaintiffs resist this claim, providing conclusory statements that they suffered economic and reputational injuries, but little support for their assertions.

-31-

Plaintiffs' response fails to address the operative issue—whether there is any evidence of their purported economic or reputational injuries.  Rather, they advance a position that any misappropriation of their image and likeness for commercial purposes constitutes economic and reputational injuries alone.  Plaintiffs are incorrect.  *See Lexmark*, 572 U.S. at 140 (stating that a plaintiff "cannot obtain relief without evidence of injury proximately caused by [the defendant's] alleged misrepresentations.").  Plaintiffs do not offer any evidence that Defendant's use of their images has caused them injury, such as loss of work opportunities.  There is nothing in the record of any incidents demonstrating a loss of goodwill associated with their image and likeness, nor any other evidence to substantiate damages arising from it.  Simply put, Plaintiffs only offer unsupported allegations of economic and reputational injuries.  Without any evidentiary support, these bare allegations are insufficient on summary judgment.  In the absence of evidence to support Plaintiffs' assertions, there is no triable issue on the false advertising claim and Defendant is entitled to judgment as a matter of law.  Defendant's motion for summary judgment on the false advertising claim is GRANTED.

## C.  State Claims

The Court will next consider Plaintiffs' state common law claims.  Plaintiffs resist summary judgment on four of their six common law claims.[4]  They bring claims for the violation of their right of privacy claims based on two causes of action.  Count IV alleges violation of the right to privacy through false light.  The other right to privacy cause of action in Count III asserts violation through appropriation of Plaintiffs' images and likenesses.  Count II is a related claim of violation of their common law right of publicity.  The remaining common law claims contested by

---

[4] Plaintiffs do not resist summary judgment on their state law conversion claim (Count V) and unfair competition claim (Count VI).  [ECF No. 82 at 5 n.4].

Plaintiffs on summary judgment are Count VII and Count VIII, alleging negligence and unjust enrichment respectively.

Defendant first requests the Court decline to exercise its supplemental jurisdiction on the remaining state law counts if the Court it granted summary judgment on the Lanham Act claims. Because the Court did not grant summary judgment on both claims, it will proceed with the merits of the state law claims.

1. Right to Privacy (Appropriation) and Publicity Claims

It appears that a specific common law tort based on the appropriation of an individual's likeness has never been expressly recognized by the Iowa Supreme Court.  United States District Court Judge Stephen Locher, this Court's colleague in the Southern District of Iowa, previously concluded the same in a different case alleging misappropriation.  *See Est. of Bisignano v. Exile Brewing Co., LLC*, --- F. Supp. 3d ----, ----, 2023 WL 7167889, at *12 (S.D. Iowa Sept. 26, 2023) (noting that "[t]he Iowa Supreme Court apparently has never decided a case involving the specific tort of appropriation of name and likeness.").  The parties do not appear to dispute Judge Locher's conclusion, and the Court finds that his analysis and prediction about the Iowa Supreme Court is sound and reliable.  *Id.* (holding "it is unfathomable that the Iowa Supreme Court would not recognize appropriation of name and likeness as a viable theory if squarely presented with the question.").

The Court will first assess the right of privacy (appropriation) claim.  Defendant argues the right of privacy by appropriation fails as a matter of law because Plaintiffs "failed to offer proof of [the Club] benefitting financially from the publication of the images at issue." [ECF No. 67 at 40–41].  Plaintiffs oppose, rejecting Defendant's claim that did not use the subject images for commercial purposes.

Without express recognition from the Iowa state courts, federal courts have looked to the Restatement (Second) of Torts to determine the contours of the tort. *See Griner v. King*, 568 F. Supp. 3d 978, 996 (N.D. Iowa 2021). Section 652C of the Restatement provides "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Id*. (citation omitted). This "tort applies only when the name or likeness is published to appropriate 'to the defendant's benefit the commercial or other values associated with the name or the likeness.'" *Id*. (citation omitted).

Defendant claims that it did not benefit from using the images at issue. Rather, it urges that its use was merely "incidental" which does not fall within the scope of a right to privacy (appropriation) tort. This position is not supported by Defendant's own authorities which explain that incidental use occurs through the mention of a plaintiff's name or likeness when discussing their public activities or "for a purpose other than taking advantage of the reputation, prestige, or other values associated with the plaintiff." *Griner*, 568 F.3d at 996 (cleaned up) (citation omitted). Defendant adds that Plaintiffs cannot prove that it benefitted financially from the use of the images anyway. This is unsupported by the case law because, as United States District Court Judge C.J. Williams, the Court's colleague to the North, recognized in *Griner*, the allegedly misappropriated image at issues here were licensed commercially to legitimate buyers, something for which the Defendant did not have to pay. *Id*. at 996–97.

The Court next assess the right of publicity claim. Defendant argues the right of publicity claim fails as a matter of law because Plaintiffs impliedly waived their right via their practice of signing releases for the specific photographs. [ECF No. 67 at 39–40]. Plaintiffs oppose, rejecting the argument as meritless. It is apparent that Defendant misguidedly conflates Plaintiffs' consent to permit *authorized* uses of their images with consent to permit *unauthorized* uses, such as

Defendant, to do the same.  There is no support for the position that Plaintiffs' consent for specific uses of their photographs by authorized individuals waives any claim for right to privacy/publicity when those same images are used without authorization.

For these reasons, Defendant's motion for summary judgment on Count II and Count III is DENIED.

## 2.   Right to Privacy (False Light) Claim

"A claim for false light invasion of privacy is based upon an untruthful publication which places a person before the public in a manner that would be highly offensive to a reasonable person."  *Doe v. Hagar*, 765 F.3d 855, 864 (8th Cir. 2014) (citing *Willson v. City of Des Moines*, 386 N.W.2d 76, 83 n.8 (Iowa 1986)).  "In addition, the [defendant] must have 'had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'"  *Id*. (citation omitted).  Defendant makes two arguments why the false light claim fails as a matter of law.

First, Defendant argues that its use of the images at issue was not highly offensive. The Court disagrees.  A jury could reasonably find that a strip club posting images of women without their consent is highly offensive.  *See Longoria v. Kodiak Concepts, LLC*, 527 F. Supp. 3d 1085, 1106–12 (D. Ariz. 2021) (concluding that "[r]egardless of whether a woman poses provocatively in other contexts, the implication that she endorses (or perhaps even strips at) a strip club could be found to be 'highly offensive to a reasonable person.'").  This argument does not support summary judgment in favor of Defendant.

Second, Defendant contends that there is no evidence that it had the requisite intent to constitute false light.  Defendant's position to place the blame entirely on the Club's third-party

contractor, Blue Frog, as the source of the images.  This assertion does not establish as a matter of law the intent element cannot be satisfied.

Defendant claims that it contracted with Blue Frog to run the Club's social media pages and it did not monitor the posts.  It alleges that it "was wholly unaware of how its contractors selected the images."  [ECF No. 67 at 7].  However, the intent standard for a false light claim requires that an actor "must have had knowledge of or acted in reckless disregard as to the falsity of the publicized matter." *Hagar*, 765 F.3d at 864.  In this case, there is evidence that raises a fair dispute whether the Defendant's characterization of its lack of involvement with Blue Frog's social media activities is accurate.  There is evidence that Blue Frog employees interacted with the Club's management regarding specific social media posts, as well as providing summaries of social media activity. *See* [ECF Nos. 82-22; 82-25].  Clearly, Defendant was aware that the women depicted in the Facebook posts at issue were not associated with the Club.  Plaintiffs also point out that it is not clear that Blue Frog was merely an arm's-length contractor, citing to evidence in the summary judgment record that the company is operated by the Club's manager. *See* [ECF No. 82 at 10] (describing Vladimir "Dima" Tsukruk, an operator of Blue Frog as "Defendant's own manager"). These facts alone raise a genuine dispute whether Defendant had the intent to commit a false light tort.  A reasonable jury may find that Defendant acted in reckless disregard for purposes of false light by posting the images at issue in this case.

There are genuine disputes whether the "highly offensive" element and the "intent" element are satisfied.  Therefore, Defendant's motion for summary judgment on the false light claim is DENIED.

### 3.   Negligence

Plaintiffs allege that Defendant was negligent for failing to exercise reasonable care in retaining and supervising contractors who operate its social media accounts.

Under Iowa law, a negligence claim requires "the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009). Defendant claims there is no evidence "showing Defendant was negligent in his retention of the independent contractors." [ECF No. 67 at 45]. Defendant again disclaims any liability by blaming Blue Frog. It offers a conclusory assertion that there is no evidence it was negligent in its retention of Blue Frog. *Id*. Plaintiffs argue that Defendant did not maintain any policies for its marketing and did not supervise Blue Frog when the company was posting images of women whom it knew were not associated with the Club. The Court finds that there is a disputed fact issue whether defendant knew or should have known about the fitness of Blue Frog. Defendant's motion for summary judgment on the negligence count is DENIED.

### 4.   Unjust Enrichment[5]

An unjust enrichment claim may lie if a plaintiff establishes: "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiffs; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001). Unjust enrichment is a "broad principle" with few limitations provided "the benefit received be at the expense of the plaintiff," but does not

---

[5] By mistake, Defendant did not include unjust enrichment in its motion. [ECF No. 88 at 2]. Regardless, the parties provide full briefs on this claim and the Court considers its merits.

need to come directly from the plaintiff.  *Id*. at 155.  "The critical inquiry is that the benefit received be at the expense of the plaintiff."  *Id*.

Defendant argues that the unjust enrichment claim fails as a matter of law because there is no evidence "of how Defendant was unjustly enriched by using the images at issue."  [ECF No. 88 at 2].  Plaintiffs oppose, arguing that Defendant unjustly benefited from the misappropriation of their photos because the images attracted customers to the Club.  [ECF No. 82 at 34].  They argue that Defendant's unauthorized use of the images conferred a benefit because the Club would have otherwise paid for them.  Plaintiffs urge the Court to deny the motion for summary judgment on this count.

As explained above, the Court cannot find that there is no dispute of material fact that Defendant did not receive a benefit from the unauthorized use of the images.  The motion for summary judgment on Plaintiffs' unjust enrichment claim is DENIED.

V.    CONCLUSION

 Based on the foregoing discussion:

- Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  [ECF No. 63].  Plaintiffs' false advertising claim under the Lanham Act does not survive summary judgment, while this case proceeds with the remaining federal and state claims.
- Defendant's Motion to Strike Opinions of Plaintiffs' Expert Dr. Thomas J. Maronick is DENIED.  [ECF No. 72].
- Defendant's Motion to Strike Opinions of Plaintiffs' Expert Stephen Chamberlin is GRANTED.  [ECF No. 77].


IT IS SO ORDERED.

Dated this 20th day of February, 2024.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT